JOSEPH COHEN, as Administrator, etc., of ROBERT COHEN, Deceased, Respondent, *v.* JOSEPH ELIAS, Appellant.

First Department, March 23, 1917.

Partnership — accounting by surviving member of firm engaged in dealing in plate and window glass — evidence as to value of assets — costs — extra allowance.

In a suit by the administrator of the deceased member of a partnership against the surviving partner who had continued the business pursuant to the partnership agreement, to compel the defendant to account, it appeared that the firm's business was dealing in plate and window glass; that there were a number of employees and that the system of bookkeeping had been very crude and unscientific. The plaintiff, instead of following the usual course of having the defendant, the accounting party, make up an account to which the plaintiff might make objections, assumed the burden of making up the account and establishing the amount due.

Evidence examined as to the amount and value of the goods on hand, the valuation of certain glass known as "salvage glass," the disposition of money received by the defendant in settlement of a fire loss, and the amount due for glass delivered on contract, and *held*, that the judgment in favor of the plaintiff should be modified.

Under the circumstances an extra allowance granted to the plaintiff should be disallowed.

APPEAL by the defendant, Joseph Elias, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of New York on the 3d day of March, 1915, upon the report of a referee, and also from an order entered in said clerk's office on the same day granting plaintiff an extra allowance.

*David Leventritt*, for the appellant.

*Herbert C. Smyth*, for the respondent.

SCOTT, J.:

This action is for a partnership accounting of the firm of Joseph Elias & Co., composed of Joseph Elias, the defendant, and Robert Cohen, now deceased, of whose estate the plaintiff is administrator. The copartnership was organized January 3, 1911, and was to have run for three years. It was terminated, however, by the death of Robert Cohen on November 15, 1911. By the copartnership agreement the surviving partner had the right to carry on the business on account of the firm until the end of the calendar year, and the defendant availed himself of that right. The accounting, therefore, covers the period from January 3 to December 31, 1911. At the inception of the partnership the defendant contributed capital valued at $78,787 and Robert Cohen contributed $7,000. Each was entitled to a weekly drawing account, and it was agreed that profits and losses should be shared equally.

The plaintiff is the father of the deceased partner. The principal witness for the plaintiff was one Herman Cohen, a brother of the deceased partner. He was employed by defendant soon after his brother's death, to wit, in December, 1911, and remained in such employ until June, 1913, shortly before this action was begun. His duties included managing the office and superintending the accounts, as Robert Cohen, the

deceased partner, had done in his lifetime. Defendant, who had brought the business up from very small beginnings, looked after the executive part of the business, buying and selling glass, making and fulfilling contracts and the like. The firm's business was dealing in plate and window glass, and there were a number of employees, including a bookkeeper, who is now a fugitive, and a foreman. The system of bookkeeping was very crude and unscientific, and this has doubtless contributed to the difficulty of the accounting and the length of the record.

This action was commenced in August, 1913. The defendant offered no objection to an accounting and the matter was sent to a referee to take and state the account. Instead of following the usual course of having the accounting party, in this case the defendant, make up an account to which the plaintiff might make objections and thus raise issues to be tried, the plaintiff assumed the burden of making up the account and establishing the amount due from defendant to plaintiff. This fact becomes of some importance in the consideration of the appeal.

A great amount of evidence was taken before the referee and a great number of exhibits read. The referee made no specific findings of fact, but reported generally that there was due to plaintiff at the date of the report (October 5, 1914) the sum of $5,132.15, with $852.79 interest thereon from January 1, 1912, amounting in all to $5,984.94. When the motion to confirm the report came on at Special Term the court made separate findings of fact and conclusions of law, finding the sum due from defendant to plaintiff on January 1, 1912, to have been $22,460.13, of which plaintiff was paid after the dissolution of the partnership $800, leaving due and owing $21,660.13, with interest from January 1, 1912.

In arriving at this result the court overruled the referee in several particulars, those which have been argued upon this appeal relating to the following subjects:

1. The amount of goods on hand on December 31, 1911.

2. The valuation of the goods then on hand.

3. The valuation to be placed on certain glass known as "salvage glass."

4. The disposition of the sum of $9,000 received by defendant in 1912 in settlement of a fire loss which had occurred and been adjusted in December, 1911.

5. The amount due for glass delivered on contract in 1911, but not paid for until after that year.

As to the value of the goods on hand December 31, 1911.

This is the most important question involved from a monetary point of view and is the most difficult one under the evidence.

An inventory was made purporting to show all the merchandise on hand as of December 31, 1911. This was made up on loose sheets of what are called "estimate sheets," being sheets of foolscap size with printing at the top indicating that the sheet was intended to contain the firm's estimate on some job. The evidence is that these sheets were bound up in pads; that these pads lay all around the premises, and that the sheets were used by the employees whenever any listing was to be done as when shipments of glass were delivered at the store, when stock was taken and the like. On the occasion of taking the inventory as of December 31, 1913, Gale, the defendant's foreman, distributed these blank sheets to different employees who wrote a list of the goods showing the case numbers and the description of the goods under each number. The extensions showing the so-called "feetage" and the estimated value were afterwards made up in the office. There were about two hundred and eighty-two of these loose sheets, which were apparently numbered consecutively or nearly so.

The principal controversy arises over sheets which, as it is claimed, were originally numbered 91, 92, 93, 94 and 95.

It is conceded by both parties that the original sheet 91 has been mislaid and plaintiff undertook to supply the deficiency. Herman Cohen swears positively that he saw this sheet and took a copy of it, and he produces the copy. Of course there is no evidence to contradict him, but notwithstanding the proof is strenuously objected to by the defendant. We think, however, that Cohen's positive oath should be accepted, and that the copy produced by him (known as Exhibit S) should be accepted as part of the inventory, especially as defendant makes no counter offer of proof as to the contents of the concededly missing page.

As to pages originally numbered 92 to 95, inclusive, a very different question arises. Assuming as he did the burden of making up the account it was incumbent upon plaintiff not only to show that certain pages were lacking from the inventory, but also what those pages contained. We think that he has succeeded in showing that there were probably four pages in the original inventory which are now missing. He has failed, however, in his effort to show what those pages contained. He did produce photographs of four sheets resembling in general characteristics the sheets which go to make up the inventory, and which bear the numbers of the missing sheets. The photographs themselves, however, show nothing except that they were copies of four papers. The originals from which they were taken are not produced or accounted for, and no persuasive evidence is produced identifying the entries on the photographs with those on the missing sheets. It is true that the witness Herman Cohen answering "yes" categorically to certain leading questions by plaintiff's counsel, attempts to make the necessary identification, but it is evident that it is the counsel and not the witness who is testifying. For these and other reasons which it is unnecessary to state at length we think that the four photographic sheets should have been rejected.

As to the valuation of the stock on hand.

The copartnership agreement provided that in case of a dissolution the stock acquired since the last inventory should be valued at its "net cost price." As no inventory was shown to have been made when the partnership was formed in January, 1911, all of the stock on hand on December 31, 1911, fell within this clause. Owing, however, to the imperfect system of bookkeeping in use by the firm it was found impracticable to ascertain the "net cost price" of the stock on hand (except salvage glass). The defendant claims that the standard of value specified in the agreement having been found impossible of application, the stock on hand should be valued as it would have been if no such standard had been provided, *i. e.*, at the value on December 31, 1911. The significance of this contention lies in the fact that the value of plate glass for the last three months of 1911 was about twenty-five per cent less than its value for

the first nine months. The referee adopted this view, but the Special Term adopted the rule of taking the average net value for the whole year 1911.

We think that both were wrong. In our opinion we should, so far as possible, carry into effect the underlying purpose of the copartnership agreement. It appeared that the firm turned over its stock two or three times a year so that it is improbable that any very large proportion of the stock on hand on December thirty-first had been bought early in the year. On the other hand, it is equally improbable that a very large proportion had been bought within the last three months of the year. A fair rule to apply, as it seems to us, would be to value the plate glass at the average market value for the last six months of the year, thus including three months of high prices and three months of low.

As to the valuation of the "salvage glass."

The firm did a large business with plate glass insurance companies, replacing glass which was broken and which was the subject of insurance. For some reason, not explained, a custom had grown up by which the firm charged these companies at an abnormally high rate for glass which it put in, and allowed an equally high rate for the broken glass which it took back. This was known as "salvage glass," and the firm always had a considerable quantity on hand, as it had when the inventory was made. The cost price of this glass was entered on the books at the inflated figure at which it had been taken from the insurance companies. This, it appears, is considerably greater than the market price. Defendant contends that he should be charged only with the market price, and in this he has been sustained by the referee. The Special Term charged him at the book price, and this we think is right. The firm had had the advantage of the high price paid for the new glass furnished, and of this advantage defendant had had his share. He should account for the salvage glass on the same basis as to the fire loss.

A fire occurred in the building in which the firm did business early in December resulting in a loss to the firm from smoke and water. The loss was adjusted during December at the sum of $9,000, but the amount was not paid until January.

The cost to the firm of the adjustment was $270, so that there was due on December thirty-first from a solvent debtor (and afterwards paid) the sum of $8,730 which was clearly a firm asset. The defendant claims, and the referee has found with him, that he should be allowed a portion of this sum because, after January first, some of the plate glass broke owing to a warping of the racks due to the fact that they had been water-soaked. The Special Term disallowed this claim and we think rightly. The question is what was the value of the assets on December 31, 1911. At that time all of the stock passed to defendant and it was his business to care for it. If he failed to do so he should bear the loss.

As to goods sold in 1911 but not paid for until 1912.

A great deal of testimony was received on this subject. Again the faulty system of bookkeeping is responsible for much of the confusion. The method employed in estimating for contracts to supply glass was that an estimate of amounts and price was furnished the contractor, the prices apparently being fixed by the defendant although not always actually written by him. If the estimate was accepted, the sheet was attached to the contract and the two filed away together. When deliveries were made delivery slips were made out bearing the date and the amount of goods delivered.

No entry was made in the books until the whole contract had been finished. The original estimates were not produced, defendant claiming that they could not be found. Both sides endeavored to reconstruct the account, plaintiff relying on Herman Cohen's recollection of the prices charged, and defendant undertaking to reconstruct the estimates from the builder's plans and his knowledge of prices at the times these estimates were made. Obviously both of these methods are unsatisfactory. At one stage of the trial the experts employed by plaintiff and defendant got together and agreed on the sum of $18,207.62 for this item. Both sides afterwards repudiated this estimate, plaintiff claiming that it should have been larger and the defendant claiming that it should have been much smaller. The Special Term adopted the plaintiff's figure. We think that neither of these extreme figures are justified

since they both rely upon the recollection of obviously interested witnesses as to matters long since past.    The safest plan is to accept the estimate once agreed upon by the experts, to wit, $18,207.62.

This covers all of the seriously disputed items as to which the Special Term overruled the referee.

To recapitulate:

The merchandise shown on Exhibit S, purporting to be a copy of the concededly missing page 91 of the inventory, should be counted as a part of the stock on hand on December 31, 1911.

The merchandise shown on Exhibits J, K, L and M, purporting to be photographic copies of pages 92, 93, 94 and 95 of the inventory, which are said to have been abstracted, should not be counted as part of the stock on hand on December 31, 1911.

The plate glass and polished wire glass on hand December 31, 1911, should be valued at the average market price of similar glass for the last six months of 1911.    The "salvage glass" should be valued at the book price, that is to say, at the valuation agreed to between defendant and the insurance companies.

The fire loss should be charged at the amount allowed on the settlement, less the cost of adjustment, being the figure fixed by the Special Term.

The value of the glass sold on contract prior to December 31, 1911, but not paid for until afterwards, should be fixed at the figure once agreed upon by the experts and not successfully attacked by either party, to wit, $18,207.62.

The result will reduce the plaintiff's judgment materially, and will be a virtual victory for the defendant.

For this reason the extra allowance granted by the Special Term should be disallowed.

We have arrived at this result after examining the voluminous record and many exhibits with great care, and with the aid of very exhaustive briefs.    If the result is not exact it is due to the careless and unscientific way in which the accounts of the firm were kept, and to the character of the oral testimony, much of which was given by interested persons, and obviously moulded so as to help the side of the controversy favored by the witness.

The decision and judgment will be modified in accordance

with the foregoing opinion and as modified affirmed, without costs to either party in this court.

CLARKE, P. J., LAUGHLIN, DOWLING and SMITH, JJ., concurred.

Judgment modified as stated in opinion, and as modified affirmed, without costs. Order to be settled on notice.